In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3272

BRIAN L. KETELBOETER,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07-C-082-S—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 10, 2008—DECIDED DECEMBER 15, 2008

Before COFFEY, RIPPLE, and MANION, *Circuit Judges*.

COFFEY, *Circuit Judge*. Brian Ketelboeter applied for disability insurance benefits, claiming that he was unable to work due to chronic pain. After conducting a hearing the ALJ denied benefits based on his finding that, although Ketelboeter could not return to his past work, he could perform a significant number of other jobs available. The district court found that substantial evidence supported the ALJ's conclusion. On appeal Ketelboeter argues that the ALJ improperly discounted

the opinion of his treating physician and failed to consider his mental health disabilities. Because the ALJ's decision is supported by substantial evidence, we affirm.

## Background

Ketelboeter, who is 53 years old, began working as a truck driver in 1988, and he was injured and claimed that in 1995, a pulley struck his rib cage while he was securing lumber onto the trailer of a truck. His family physician, Dr. David F. Cook, diagnosed him with a sprained rib and recommended that he wear a rib belt for support and undergo physical therapy treatments, which he failed to pursue. Ketelboeter also received chiropractic treatment in 1996 and 1997, for neck, chest, and back pain. In early 1997, Ketelboeter again complained of rib pain with soreness in his neck and back. A bone scan, chest x-ray, and blood tests revealed no problems, even though an emergency-room doctor diagnosed him with a chest-wall sprain with spasms. Later on, Ketelboeter fell and bruised his shoulder. Thereafter he received treatment for his pain frequently from Dr. Richard J. Horecki, while undergoing treatment for his chest and rib pain throughout that year. Dr. Horecki prescribed steroid anti-inflammatory drugs and in January 1998, diagnosed that he was suffering from costochondritis, an inflamation of cartilage "where the rib and breast-bone [sternum] are joined." (Mayo Clinic, http://www.mayoclinic.com/health/costochondritis/DS00626 (visited Aug. 18, 2008)).

In early 1998, Ketelboeter saw Dr. Tuenis D. Zondag, who recommended that he receive injections and physical

therapy to treat his pain. Ketelboeter attended physical-therapy sessions, but refused to accept the prescribed injections. Instead he was attempting to manage his pain with walking and aerobic exercise—a program that previously had provided him with some relief. Throughout 1998 and 1999, Drs. Horecki, Zondag, and Cook also treated Ketelboeter's chronic pain with ibuprofen and Tylenol 3.

In 2000, an MRI showed a flattening and deformity of his spinal chord accompanied with a stenosis, disk protrusion, degenerative changes, and osephyte formation. After complaining that his chest wall was giving him pain and discomfort, Dr. Zontag prescribed Ultram (a pain-killer) and Volatren (an anti-inflammatory medication), though Ketelboeter complained that the medications were less than effective in relieving his pain. In May 2001, Dr. Zondag observed that Ketelboeter had reduced tolerance for sitting and standing and he would need accommodations to alternate between those positions.

In February 2002, Ketelboeter saw another doctor, Dr. Erik Dickson, who noted that physical therapy together with Flexeril, a muscle relaxant, had relieved his pain. Dr. Dickson continued to treat Ketelboeter with ibuprofen and Flexeril and did not see him again until Ketelboeter reinjured himself one year later. Dr. Dickson once again prescribed Flexeril and Ketelboeter reported some improvement.

Although Ketelboeter worked for eight years after his injury, in June 2003, he stopped working because, he says, the pain in his rib cage was radiating into his sternum,

shoulders, and arms, preventing him from doing his job. Dr. Dickson examined Ketelboeter again in September 2003. He opined that he did not know what was wrong with Ketelboeter, but that his alleged "pain [was] out of proportion with his physical findings." Ketelboeter's x-rays and bone scans were negative, and a rheumatologist found no evidence of rheumatic disease despite a small positive rheumatoid factor in his blood. The rheumatologist diagnosed Ketelboeter as having rib tip syndrome (rib pain), xiphodynia (sternum pain), and history consistent with rotator-cuff disease, and prescribed Vioxx, which Ketelboeter did not take. Ketelboeter also declined more aggressive recommended remedies like injections or surgery.

In September 2003, Ketelboeter applied for Disability Insurance Benefits, claiming that he had been disabled since July 25, 2003. A non-treating state-agency physician reviewed Ketelboeter's application and medical record and concluded that Ketelboeter could lift up to ten pounds frequently and twenty pounds on occasion, and could sit or stand up to six hours a day. Two months later Ketelboeter's treating physician, Dr. Dickson, determined that Ketelboeter could only perform work that allowed him to sit or stand at will and to take 3 to 4 short breaks during the work day. Dr. Dickson concluded that Ketelboeter could only occasionally lift 10 pounds and rarely or never lift more, and could rarely twist, bend, crouch, or climb. Even with those restrictions, Dr. Dickson continued, Ketelboeter would have to miss work about three days per month. Finally, the doctor noted that emotional distress did not augment Ketelboeter's physical limitations.

In April 2005, an ALJ held an administrative hearing dealing with the plaintiff-appellant's claim during which Ketelboeter and a medical expert also testified. Ketelboeter testified that he walked half a mile to a mile four times a week, but that it was hard for him to bend down, sit for long periods of time, drive, or do housework. The medical expert observed that the only objective evidence of Ketelboeter's injury was localized tenderness, and stated that he could do light work, including lifting 20 pounds occasionally and 10 pounds frequently, so long as he had the option to sit or stand. The vocational expert assumed that Ketelboeter could lift 20 pounds occasionally, 10 pounds frequently, could stand or walk or sit for six hours a day but could sit or stand as needed during the course of his work day, and was restricted in the kinds of work he could do involving overhead reaching. Based on these assumptions, the expert opined that Ketelboeter could not perform his past-relevant work, but could perform other jobs, such as bench hand, assembler, or office helper, as those jobs are described in the Dictionary of Occupational Titles (DOT). Finally, the vocational expert testified that if he were to assume that Ketelboeter had the limitations that Dr. Dickson identified, no jobs would be available to him.

The ALJ denied Ketelboeter's claim for disability benefits, and the Appeals Council upheld the ALJ's decision. Ketelboeter attempted to respond with additional submissions of medical evidence, including Dr. Dickson's additional statement recommending that Ketelboeter would have to take five to six unscheduled breaks during the work day rather than three to four and he would

probably miss more than four days of work per month. After reviewing the new evidence, the ALJ granted Ketelboeter another hearing.

At the second hearing, Ketelboeter testified that his pain had increased since the first hearing and he could now only walk around the yard. Ketelboeter stated that he had to change positions frequently and spent most of his time sleeping, though he sometimes observed and advised his family when they did chores on their farm, including milking cows and maintaining the tractor. He also testified that Dr. Dickson had prescribed him an anti-depressant, but did not refer him to a mental-health professional. A state-agency medical expert, Dr. Andrew Steiner, testified that he observed little objective evidence of Ketelboeter's pain, and, relying on that objective evidence and discounting Ketelboeter's inconsistent self-reports of pain and discomfort, concluded that Ketelboeter could do light lifting and occasional over-head work. Moreover, continued the doctor, no medical evidence suggested that Ketelboeter had to change positions frequently. Despite the new evidence, the ALJ asked the vocational expert to assume that Ketelboeter had the same limitations that he asked the vocational expert to assume in the first hearing. The vocational expert this time identified several other new jobs he thought Ketelboeter could perform, including locker room attendant, someone who marks prices to merchandise, and parking lot attendant. The ALJ did not ask the vocational expert if his view of those jobs differed from the descriptions of the jobs in the DOT.

The ALJ denied Ketelboeter's claim, finding that he could work in a significant number of jobs in the national economy. The ALJ found that Ketelboeter's characterization of the "intensity, persistence, and limiting effects" of his symptoms was not entirely credible and furthermore lacked support with objective evidence in the record. Moreover, the ALJ reasoned that Ketelboeter's decisions to abandon physical therapy and to "routinely reject more aggressive care" were inconsistent with his claims of severe pain. And, the ALJ continued, Ketelboeter continued to perform basic life activities and succeeded in working for eight years after his initial injury without any objective evidence that his physical condition had worsened. In so ruling, the ALJ placed more weight on the testimony of non-examining reviewing medical experts who had reviewed his medical records, x-rays, and scans, than that of Ketelboeter's treating physicians, finding that Dr. Dickson's conclusions were inconsistent with both objective medical records and Dickson's own observation that Ketelboeter's reported pain exceeded the physical evidence. Ketelboeter sought further review, but the Appeals Council denied that request and the district court affirmed the ALJ's decision. Ketelboeter appeals.

## Analysis

Because the Appeals Council declined to review the ALJ's decision, we treat the ALJ's ruling as final. *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). We will affirm the ALJ's decision if it is supported with

substantial evidence. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Evidence counts as "substantial" so long as it is "sufficient for a reasonable person to accept as adequate to support the decision." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (internal quotation marks omitted). We cannot substitute our judgment for that of the ALJ when assessing the weight of the evidence. *See id.*; *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

On appeal Ketelboeter argues that the ALJ's decision is unsupported by substantial evidence. Specifically, he claims that the ALJ improperly placed more weight on the opinions of the state-agency doctors than those of his treating physician and thus erroneously found that his symptoms were not credible. Ketelboeter also con-tends that the ALJ should have asked the vocational expert if his testimony conflicted with the DOT and that the ALJ neglected to probe adequately the vocational expert's opinion. Finally, Ketelboeter maintains that the ALJ failed to consider his mental impairments together with his physical ailments.

A treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "consistent with substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2); see also *Schmidt*, 496 F.3d at 842; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). The treating physician's opinion is important because that doctor has been able to observe the claimant over an extended period of time, but it may also be unreliable

if the doctor is sympathetic with the patient and thus "too quickly find[s] disability." *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985); *see also Schmidt*, 496 F.3d at 842. Accordingly, if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it. *See White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005); *Skarbek*, 390 F.3d at 503.

Substantial evidence supports the ALJ's decision to give greater weight to the state-agency doctors' opinions than to that of Ketelboeter's treating physician, Dr. Dickson. As the ALJ observed, the record contains scant objective evidence in support of the alleged severity of Ketelboeter's self-reported symptoms and accompanying pain and discomfort. For example, repeated x-rays showed no physical changes that might have cor-roborated the claimed increase in pain that Ketelboeter reported over time. *See Skarbek*, 390 F.3d at 504 (upholding ALJ's decision to discount treating physician's finding that claimant had limited range of motion because it was not supported by x-rays or other medical evidence). Dr. Dickson's conclusions about Ketelboeter's limitations were based almost entirely on Ketelboeter's subjective complaints rather than objective evidence. His conclu-sion was also internally inconsistent: he believed Ketelboeter's reported pain was out of proportion with the physical evidence and objective evidence in the record, but nonetheless concluded that he was disabled.

Ketelboeter next argues that the ALJ erred by failing to ask the vocational expert if his testimony conflicted

with the DOT. An ALJ has an affirmative duty to ask a vocational expert if the evidence that the expert has provided about job limitations conflicts with the job requirements listed in the DOT, and if the evidence appears to conflict, the ALJ must ask the vocational expert to explain the conflict. *Prochaska v. Barnhardt*, 454 F.3d 731, 735 (7th Cir. 2006). Here, as the Commissioner concedes, the ALJ did not fulfill that duty at the second hearing, but his error is harmless. *See Keys v. Barnhart*, 347 F.3d 900, 994-95 (7th Cir. 2003) (applying harmless error analysis to claim for disability benefits).

The DOT's descriptions of the jobs that the vocational expert discussed do not conflict with the hypothetical limitations given by the ALJ. Ketelboeter insists that the "price marker" job requires "frequent overhead reaching," which he is unable to perform, but the DOT description does not support that assertion. Ketelboeter also contends that he cannot perform the requirements of a parking-lot attendant's job because it requires the ability to drive a car, but in fact the DOT description states that the attendant "records time and drives automobile to parking space, *or* points out parking space for customer's use." (emphasis added). The non-driving alternative separated by a disjunctive eliminates the need for a vocational expert to explain any discrepancy, and in any event, the vocational expert did make clear that the jobs he identified would not require driving.

Ketelboeter is on stronger ground when he suggests that the DOT for the locker-room attendant job, which requires "plac[ing] container on storage shelf or rack"

might conflict with the ALJ's hypothetical limitation against overhead work. But even so, nothing in the record negates the evidence from the first hearing that, based on the limitations assessed by the ALJ, Ketelboeter could find a job as a bench hand, assembler, or office helper. The ALJ's failure at the second hearing to ask the vocational expert if his testimony conflicted with the DOT was therefore harmless.

Ketelboeter also claims that the ALJ erred by failing to include the hypothetical question of what was the frequency with which Ketelboeter would have to sit and stand. The ALJ told the vocational expert to assume that Ketelboeter would "have to have a sit, stand option where he could sit or stand as needed during the day." According to Ketelboeter, the ALJ was required to describe how often he would need to change position. But a job in which Ketelboeter could sit or stand "as needed" would necessarily encompass frequent sitting and standing. Changing positions "as needed" allows an employee broad flexibility and thus has a more re- strictive effect on the jobs available to him than the lim- itation Ketelboeter thinks the ALJ should have described.

Finally, Ketelboeter argues that the ALJ erred by failing to consider the limited amount of evidence of his mental impairments. That evidence, however, is exceed- ingly sparse. The only record evidence of impaired mental health that Ketelboeter points to is (1) Dr. Dickson's notes that Ketelboeter's physical pain caused him anxiety and adjustment problems and (2) his prescription for anti-depressants. We agree with the ALJ that no

physician asserted that any anxiety or depression impaired Ketelboeter's ability to work. After reviewing the record, we are convinced that there is substantial evidence supporting the ALJ's finding that Ketelboeter's purported mental impairments did not impair his physical condition to the point of disability.

## CONCLUSION

The ALJ's decision holding that Ketelboeter is not disabled is supported by substantial evidence.

AFFIRMED.