NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 9, 2009
Decided July 7, 2009

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 08-3914

|  |  |
|---|---|
| RONALD L. ZIEGLER, | Appeal from the United States District Court for the Western District of Wisconsin. |
| *Plaintiff-Appellant*, | |
| *v.* | No. 08-cv-006 |
| MICHAEL J. ASTRUE, | Barbara B. Crabb, |
| Commissioner of Social Security, | *Chief Judge*. |
| *Defendant-Appellee*. | |

**O R D E R**

Ronald Ziegler, then 43 years old, applied for disability insurance benefits, asserting that after thirteen years at the post office, he could no longer work as a mail handler based on a variety of physical and mental ailments. The ones relevant to this appeal are a degenerative spinal condition, obesity, and a panic disorder. The ALJ found these ailments to be "severe impairments," but went on to find that Ziegler was not disabled and denied

his application.  The Appeals Council denied Ziegler's request for review, and the district court affirmed, *Ziegler v. Astrue*, 576 F. Supp. 2d 982 (W.D. Wis. 2008).  Ziegler appeals, and we affirm.

**Background**

**A. Medical Records**

The relevant medical history regarding treatment of Ziegler's physical ailments begins in March 2004 when he sought emergency treatment for chronic back pain with symptoms in his left leg.  He was prescribed a painkiller and a muscle relaxant and referred to his primary care physician.  A physician's assistant at the clinic where Ziegler received his primary care prescribed more medication, limited Ziegler to lifting no more than 10 pounds, and recommended physical therapy.  After six sessions of physical therapy, Ziegler said his lower back felt "fine."  He returned to work as of April 13, 2004, but apparently injured his upper back that same day.  That injury caused pain in Ziegler's right arm, but it apparently went away on its own.  Dr. Edward Kramper saw Ziegler in May 2004 and observed that the pain in Ziegler's arm was "essentially gone," but noted some other pain in his spine.  Dr. Kramper said that Ziegler could continue working, but recommended more physical therapy.

Ziegler returned to physical therapy for eight sessions in May and June, 2004.  A report from his final session on June 21 documents that Ziegler told the physical therapist that he was back at work performing his job duties without issue.  A month later, though, Ziegler stopped working again and returned to Dr. Kramper because the pain in his left leg had returned.  Dr. Kramper suggested that he be restricted to light duty at work for two to three weeks to allow his back time to improve.  Dr. Kramper saw Ziegler again in August and wrote that his back strain and his pain had improved and that he could return to work with some restrictions.  In September, Ziegler saw Dr. Kramper again about both areas in which he felt pain: his left leg where the pain seemed to be related to his lumbar spine (roughly speaking, the lower spine) and his right arm where the pain seemed to be related to his thoracic spine (roughly speaking, the upper spine).  Dr. Kramper's notes indicate that Ziegler had continued to work with restrictions, but that the pain persisted.  Accordingly, Dr. Kramper ordered an MRI.

Dr. Kramper reviewed the MRI with Ziegler in October 2004 and reported some disc herniation and bulging in the lumbar spine, but a normal thoracic spine despite continuing thoracic pain.  Dr. Kramper referred Ziegler to Dr. Craig Dopf, a back surgeon, to determine whether surgery could help.  Dr. Dopf met with Ziegler in November and substantially agreed with Dr. Kramper's diagnosis.  With respect to Ziegler's lumbar spine, Dr. Dopf

explained that the "operative treatment would be decompression and fusion," i.e., surgery, but that Ziegler was not eligible because he was a smoker. Regarding Ziegler's continued thoracic and cervical pain, Dr. Dopf recommended another MRI. Nurse practitioner Martine Batson, who worked in Dr. Dopf's office, examined that second MRI and opined that although it was consistent with Ziegler's reports of thoracic pain, it did not account for his reported cervical pain. Reasoning that carpal tunnel syndrome might be the culprit, Batson referred Ziegler to a carpal tunnel specialist.

The remaining medical records concerning Ziegler's physical condition were all generated after he filed his disability claim. Two different state-agency physicians reviewed Ziegler's records and concluded that he could perform light work with occasional postural limitations. The opinions of those doctors seem to have prompted Ziegler to obtain his own evaluation. He first requested one from Dr. Dopf, but Dr. Dopf's office would not provide an evaluation, referring him instead to his primary care physician. Accordingly, Ziegler returned to the clinic where he had previously been treated. Ziegler was seen by Dr. Curtis Bush, who ordered a functional capacity evaluation. That evaluation was performed by physical therapist James Pankratz, who concluded that "Mr. Ziegler is able to work at the LIGHT-MEDIUM Physical Demand Level."

Dr. Bush then reviewed Pankratz's evaluation with Ziegler and completed his own evaluation. Dr. Bush did not offer an opinion about the level of work Ziegler could handle, but he did identify several limitations. He explained that Ziegler's condition would result in frequent interference with attention and concentration, that Ziegler could not sit or stand for more than 30 minutes without changing position, that he could sit for only two hours in an eight-hour day, that he could stand or walk for only two hours in an eight-hour day, that he could not look down, twist, or climb a ladder, and that he could stoop or turn his head left or right only rarely.

The relevant record regarding Ziegler's mental health is much smaller. In December 2004, Dr. Keith Bauer, a state-agency therapist, noted that Ziegler had been diagnosed with panic disorder but concluded that Ziegler's only functional limitation was a mild restriction of the activities of daily living. Dr. Bauer concluded that Ziegler had no severe psychological impairment. In July 2005, Ziegler consulted with Dr. Scott Bohon, a psychiatrist, for the first time. According to Dr. Bohon's notes, Ziegler had been treated by Dr. Ed Sheldon since 2000 for his panic disorder, but had to find a new provider because of a change in his insurance coverage. Ziegler described panic episodes lasting up to two hours for which Paxil, prescribed by Dr. Sheldon, was providing significant but not complete relief. Beyond Dr. Bohon's notes, the record contains no information about Dr.

Sheldon or his treatment of Ziegler. Dr. Bohon increased the dosage on the Paxil and recommended a follow-up meeting within one month. In a mental-impairment questionnaire, Dr. Bohon repeated Ziegler's reports of his panic attacks and concluded that Ziegler "cannot function at work due to poor stress tolerance, episodic panic attacks at work, [and] getting upset with others," and that his panic disorder "amplifies his chronic back pain." But Dr. Bohon also noted that he had just met Ziegler and, therefore, Ziegler's prognosis was "unknown."

The only other record of Ziegler's mental condition is contained in notes by Dr. James Schneider, an internist Ziegler saw regularly at a VA hospital for multiple medical problems not related to his disability claim. Dr. Schneider's notes from each such consultation list the following as an active problem: "Anxiety/panic attack 9/00." But there is no suggestion that Dr. Schneider, who is not a mental-health specialist, provided any diagnosis or treatment of Ziegler's panic attacks.

**B. ALJ Hearing**
The ALJ conducted a hearing at which Ziegler, his wife, and a vocational expert testified. Ziegler testified that he stopped working on April 12, 2004, because he lost the use of his left leg and right arm. He explained that his leg problem was caused by herniated discs in his lumbar spine, that he had gone through prescribed physical therapy for it, that he had refused injections to treat the pain, and that as a smoker he was not a candidate for surgery. Ziegler also described his symptoms: he cannot walk without a cane, he suffers intense pain after any type of rocking motion, he cannot stand unassisted for more than ten minutes, he can walk only a couple of city blocks, and he can lift only ten or fifteen pounds while in a seated position but not repeatedly. Ziegler next explained that his arm problem was caused by a bulging disc, but had been "resolved for the most part." Ziegler said, though, that he continued to have trouble gripping with both hands. Ziegler also discussed his panic attacks, explaining that they had caused him to miss work and that he continues to suffer from them.

Ziegler's wife testified next and corroborated his description of his daily life. According to his wife, Ziegler could no longer do household chores, he could not stay on his feet long enough to go grocery shopping, and he spent five or six hours a day in his recliner. She also discussed Ziegler's panic attacks, explaining that when they strike, Ziegler shuts off from the outside world for hours at a time.

The VE testified last. The ALJ asked the VE to consider someone with Ziegler's age, education, and work history who (1) is "limited to light work," (2) is "precluded from any

climbing of ropes, ladders, or scaffolds," (3) is "precluded from more than occasional climbing of ramps or stairs," (4) is "precluded from more than occasional stooping, bending, crouching, crawling, kneeling or twisting," (5) is "precluded from standing more than 30 minutes or sitting more than 30 minutes at a time," (6) has a "limited but satisfactory [ability] with regard to relating to coworkers, interacting with supervisors, understanding, remembering, and carrying out detailed job instructions and behaving in an emotionally stable manner," and (7) "is seriously limited but not precluded with regard to dealing with the public and dealing with work stresses." The VE testified that, considering all of these limitations, such an individual would not be able to perform Ziegler's past work as a mail handler, but would be able to perform the job of post office clerk as it is defined by the Dictionary of Occupational Titles. The VE also testified that there existed other jobs that such an individual could perform in Wisconsin. As examples, the VE listed mail clerk, parking lot attendant, injection molding machine tender, office helper, and x-ray inspector.

Next, the VE testified that there were other jobs that the individual could perform even if he was limited to sedentary work: "order clerk food and beverage" and telemarketer. Finally, Ziegler's lawyer questioned the VE and asked him to consider Ziegler's "very poor" performance on a test of occasional material handling given to him by Pankratz, the physical therapist. The VE explained that someone who fell in the eighth percentile for material handling would not be acceptable for any of the jobs he had identified.

**C. ALJ's Order**

In his order, the ALJ followed the five-step sequential evaluation process for determining if a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). At step one, the ALJ found that Ziegler had not engaged in substantial gainful activity since he stopped working. At step two, the ALJ found that Ziegler was suffering from three severe impairments: obesity, anxiety disorder, and degenerative spinal disease. Next, at step three, the ALJ found that none of Ziegler's impairments meet or equal a listed impairment. Then, at step four, the ALJ found that Ziegler had the residual functional capacity to perform "a range of light work." The ALJ credited Ziegler's statements about the existence of his symptoms but refused to credit his statements about the severity of those symptoms. The ALJ refused to credit both Dr. Bush's opinion, which the ALJ read to conclude that Ziegler could not perform light work, and Dr. Bohon's opinion that Ziegler suffered severe mental limitations.

Regarding Ziegler's physical impairments, the ALJ relied on the bottom-line conclusion of Pankratz, the physical therapist, who determined that Ziegler could perform

light to medium work.  As further support for crediting Pankratz over Dr. Bush, the ALJ asserted, incorrectly, that Dr. Bush had not reviewed Pankratz's report.  The ALJ also relied on evidence from the office of Dr. Dopf, the back surgeon.  First, the ALJ reasoned that by directing Ziegler to his primary-care physician for an evaluation, Dr. Dopf had "refused to assign any limitations at all."  Second, the ALJ relied on the comments of Batson, the nurse practitioner in Dr. Dopf's office.  The ALJ read Batson's statement that Ziegler's MRI was not consistent with his thoracic pain to mean that the MRI was not consistent with any of his symptoms.

Regarding Ziegler's mental impairments, the ALJ relied on the opinion of Dr. Bauer, the state-agency therapist, who concluded that Ziegler had no severe mental impairment. The ALJ noted that Dr. Bauer's opinion was affirmed by "other personnel of the State agency," but what he was referring to is unclear.  The ALJ discounted Dr. Bohon's assessment because it was based primarily on Ziegler's own reports and because the ALJ thought it was contradicted by the reports of Dr. Schneider, the VA internist.  As the ALJ read Dr. Schneider's notes, they did not "indicate anything but continued stability on medication."

The ALJ then concluded, based on his RFC finding and the VE's testimony, that Ziegler was capable of "performing [his] past relevant work as a post office clerk." According to the ALJ, the VE testified that Ziegler's limitations "would not preclude [his] past work as a postal clerk as that job is generally performed within the national economy." The ALJ continued on to step five and made an alternative finding, again based on the VE's testimony, that jobs existed in significant numbers that someone with Ziegler's limitations could perform.  The ALJ did not mention the VE's testimony regarding Ziegler's performance on the test of occasional material handling.  Accordingly, the ALJ found that Ziegler was not disabled.

The Appeals Council denied Ziegler's request for review, making the ALJ's decision the final decision of the Commissioner.  The district court upheld that final decision. *Ziegler*, 576 F. Supp. 2d at 982.

## Analysis

On appeal Ziegler challenges four different categories of findings by the ALJ: findings regarding his physical condition, findings regarding his mental conditions, credibility findings, and the findings regarding what jobs Ziegler could perform.  We review the ALJ's ruling directly without giving deference to the district court's decision, *see Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009), and will uphold the ALJ's ruling so long

as it is supported by "substantial evidence," *see* 42 U.S.C. § 405(g), i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

### A. Ziegler's Physical Condition

The first mistake Ziegler assigns to the ALJ is crediting the opinion of Pankratz over that of Dr. Bush. According to Ziegler, the ALJ should not have relied on Pankratz's conclusion that Ziegler was capable of performing jobs at the light or medium exertional level. Ziegler argues that the more-detailed findings in the report show that he was not able to perform even sedentary work. Indeed, the report notes that Ziegler was able to sit or walk only occasionally and stand, reach, or bend only infrequently. But Ziegler is wrong to believe that these limitations preclude him from performing light work. A job is in the light work category "when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Ziegler may be correct that he could not perform a job that required "a good deal of walking or standing," but his argument ignores the remainder of the definition. Based on the complete definition of light work, Pankratz's bottom-line conclusion is not contradicted by his detailed report.

The ALJ was, therefore, free to rely on Pankratz's conclusion to disbelieve the conclusion of Dr. Bush. The ALJ was mistaken in thinking that Dr. Bush made his conclusion without seeing Pankratz's report, but the error is immaterial. The ALJ properly considered Dr. Bush's opinion and found Pankratz's opinion to be more persuasive. We have reviewed the two reports: Pankratz's report and conclusions total 14 pages and contain the results of dozens of tests. Dr. Bush's report is 4 pages long and seems to contain little more than Ziegler's own self-reported symptoms. The ALJ's decision to credit Pankratz's report over Dr. Bush's is supported by substantial evidence. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

### B. Ziegler's Mental Condition

Next, Ziegler moves to his mental condition and contests the ALJ's finding that he does not suffer from severe mental limitations. Although Dr. Bohon concluded that Ziegler's panic disorder prevented him from working, the ALJ refused to credit his report, instead relying on the report of Dr. Bauer, the state-agency therapist, who concluded that Ziegler does not have a severe mental impairment. Ziegler asserts that the ALJ should not have relied on Dr. Bauer's opinion because, in contrast to the opinion of Dr. Bohon, it was

not based on an in-person examination and because it did not take Dr. Bohon's opinion into account.

First, Ziegler is correct that the opinion of an "examining physician" is entitled to greater weight, *see* 20 C.F.R. § 404.1527(d)(1), but the ALJ was entitled to give Dr. Bohon's opinion less weight because it was based only on Ziegler's self-reported symptoms. *See Ketelboeter*, 550 F.3d at 625. Even though a psychiatrist's examination will often involve little more than analyzing self-reported symptoms, Dr. Bohon's report does not show much analysis and was prepared after only one meeting with Ziegler. Although it says that Ziegler cannot function at work, in the space for a prognosis, it reads, "Unknown; I just met him." At another point in the report, Dr. Bohon wrote, "I don't know him well enough to explain further." Given the inconclusiveness of the report and the other record evidence that contradicts its conclusion, the ALJ's finding is supported by substantial evidence. *See Berger v. Astrue*, 516 F.3d 539, 544-45 (7th Cir. 2008).

**C. Ziegler's Credibility**

Ziegler next argues that the ALJ erred in discrediting his descriptions of his own symptoms. This court defers to the credibility determination of the ALJ; it will be upheld unless it is "patently wrong." *See Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). The credibility determination here was based on the following: according to the ALJ, "several treating physicians" disagreed with Ziegler's assessment of his symptoms, Ziegler seemed to make two complete recoveries before quickly reinjuring himself upon returning to work, and in his meetings with doctors, Ziegler showed a suspicious familiarity with the legal issues surrounding his legal claims.

Although an ALJ may reasonably disbelieve a claimant's testimony when it is contradicted by medical evidence, *see Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008), Ziegler argues that the ALJ misunderstood the medical evidence. He cites Pankratz's report first, but, as discussed above, the ALJ properly relied on that report. The ALJ did err regarding what it took to be the observations of Dr. Dopf, the back surgeon, and Batson, the Nurse Practitioner in Dr. Dopf's office. Dr. Dopf declined to provide a functional capacity evaluation because he was not Ziegler's primary care physician. That is not the same as refusing "to assign any limitations at all." And the Commissioner concedes that the ALJ misunderstood Batson's comment. She said only that Ziegler's cervical pathology was inconsistent with *some* of his symptoms; she did not say that all of his symptoms were inconsistent with his spinal pathology. But those errors do not require reversal. So long as there is some record support for the credibility determination, we will not reverse. *Berger*, 516 F.3d at 546. Here, despite the errors, there was sufficient medical evidence in the record

on which the ALJ properly relied in discrediting Ziegler's testimony. Combined with the ALJ's observations that Ziegler quickly reinjured himself after two attempts to return to work and that he "appeared very conversant with the legalities" involved in his claims, the ALJ's credibility finding was not patently wrong.

**D. Jobs Available to Someone with Ziegler's Characteristics**

Ziegler's final arguments are that ALJ erred at step four when he found that Ziegler could perform his past relevant work and at step five when he found, in the alternative, that jobs exist in significant numbers that Ziegler could perform. Ziegler is correct that the ALJ's step-four finding was error because the VE had testified only that Ziegler could perform the job of post office clerk as defined by the Dictionary of Occupational Titles. No evidence supported a finding that Ziegler could perform the job he had actually done. But as Ziegler acknowledges, this error is immaterial if we uphold the ALJ's alternative finding at step five. We have already upheld the findings on which the ALJ based the hypothetical question posed to the VE and Ziegler has not questioned the reliability of the VE's testimony that jobs existed in significant numbers that a person described in the hypothetical could perform. *See Britton v. Astrue* 521 F.3d 799, 803 (7th Cir. 2008). Before relying on that testimony, it might have been preferable for the ALJ to mention the VE's testimony regarding Ziegler's performance on a single test performed by Pankratz, the physical therapist. But as we explained above, the ALJ properly relied on Pankratz's ultimate conclusion, so considering Ziegler's performance on just one of many tests was unnecessary. Thus, the ALJ's step-five finding was supported by substantial evidence. *See Schmidt v. Astrue*, 496 F.3d 833, 845-46 (7th Cir. 2007).

## Conclusion

Accordingly, we AFFIRM the Commissioner's decision.