**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

Argued September 8, 2011
Decided January 6, 2012

**Before**

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

| | |
|---|---|
| No. 10-3779 | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| DOROTHY MURPHY, | |
| *Plaintiff-Appellant*, | |
| | No. 09 CV 7929 |
| *v.* | |
| | Harry D. Leinenweber, *Judge*. |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| *Defendant-Appellee*. | |

**O R D E R**

Claiming that she suffers from various physical and mental limitations, Dorothy Murphy applied to the Social Security Administration for supplemental security income and disability benefits. After an evidentiary hearing, the Administrative Law Judge (ALJ) found that despite Murphy's limitations, there were a sufficient number of jobs available for a person in her condition, and consequently denied her application. When the Appeals Council declined review, the ALJ's decision became the final decision of the Social Security Commissioner. Murphy unsuccessfully sought relief from the federal district court, and she now appeals to this court. Because there is substantial evidence in support of the decision to deny benefits, we affirm.

I.

In October 2005, Murphy applied for Disability Insurance Benefits and Supplemental Social Security Income, alleging a disability that began in March 2000 following a car accident. After her claims were initially denied, she requested a hearing before an ALJ. The hearing took place on August 7, 2008.

At the time of the hearing, Murphy was approximately 46 years old. She had completed her education through the eleventh grade and had qualified to work as a certified nursing assistant (CNA). From the time her alleged disability began in 2000 until 2005, she had worked full-time as a CNA. In July 2005, she was laid off of work. From November 2006 to the hearing in 2008, she was employed part-time as a CNA, working Saturdays and Sundays for a total of fifteen hours per week. Murphy testified that her employer was pleased with her current work performance, and that she had requested to work full time.

Murphy's treating physician, Dr. Woodard, reported that Murphy suffered from depression, which resulted in moderate limitations in her ability to deal with normal work stress. He also reported that Murphy had irritable bowel syndrome, and some back, shoulder, and neck pain. Dr. Woodard's assessment of Murphy's residual functional capacity (RFC) contained certain limitations, such as requirements that she be allowed to alternate between sitting, standing, and walking; that she be allowed unscheduled bathroom breaks; and that she was limited to occasional lifting of no more than twenty pounds and frequent lifting of no more than ten pounds.

An independent psychiatrist, Dr. Radomska, conducted one 45-minute examination of Murphy. Dr. Radomska found that Murphy was irritable and stressed, and diagnosed her as having a "possible adjustment disorder with depressed mood and possible delusional disorder."

An agency physician, Dr. Glen, reviewed the record and the Woodard and Radomska reports. He surmised that Murphy did not have a severe mental impairment, but rather an irritable and demanding personality. Dr. Glen believed that Murphy was capable of simple unskilled work, but recommended against her working with the public. Another doctor, Dr. Kenney, accepted the RFC assessment of Dr. Woodard for the most part, but rejected some of limitations described by Dr. Woodard, opining that they were not based on anything but Murphy's subjective complaints. Dr. Kenney concluded that Murphy was capable of work as long as some physical limitations were taken into account, such as limited lifting, and flexibility between sitting and standing.

At the hearing, Murphy testified about her physical ailments and her daily activities. When the ALJ asked her about any mental impairments, Murphy testified that she was not

being treated for depression or receiving any medication for depression, and she denied that she had any trouble getting along with others. She also testified that she had steady attendance at her part-time job as a CNA, that she had no employment troubles, and that her employer was pleased with her work.

The Vocational Expert (VE) also testified at the hearing. The ALJ presented to the VE a hypothetical case with RFC limitations that included the ability to do light, unskilled work, with flexibility between sitting and standing. The VE opined that this condition would preclude a person from engaging in work as a CNA. The ALJ asked about the availability of jobs for a person with these RFC limitations and with the additional requirement that the person have no social contact. The VE said that there were no available jobs. When asked about a person with the same limitations but who was permitted social contact, the VE replied that there were thousands of available jobs—for example, even with the added limitation of limited reading and math skills, the VE said that there were approximately 4,300 positions as an office clerk and 4,700 positions as an information clerk.

On September 18, 2008, the ALJ issued its written opinion, after conducting the five-step inquiry set out in 20 C.F.R. § 404.1520. For the first step of the inquiry, the ALJ found that Murphy had not engaged in substantial gainful activity since she had been laid off from full-time work in July 2005.[1] At the second step, the ALJ found that Murphy had severe impairments including irritable bowel syndrome, a limited ability to read and write, and pain in the lower back, left knee, left elbow, and right shoulder. The ALJ also found that Murphy suffered from some limited depression, but that this mental limitation was not severe and was only a minimal limitation in performing basic work activities.

At the third step, the ALJ concluded that Murphy's impairments did not meet or equal one of the Commissioner's listed impairments. Accordingly, the ALJ determined that Murphy had the RFC to perform light work with the following limitations: that the work consist of simple tasks involving limited reading and math requirements; that she needed to shift positions because she could only stand or sit for twenty minutes at a time; that she could lift or carry only twenty pounds occasionally and ten pounds frequently; and that, while frequently shifting her positions during the day, she could stand or walk for only a total of six hours in an eight-hour work day, and sit for only a total of six hours in an eight-hour work day.

[1]The ALJ also found that Murphy had been engaged in substantial gainful activity from the onset of her disability in March 2000 to her loss of full-time employment in July 2005, and thus was not entitled to benefits during that time. Murphy does not challenge this finding, so we are concerned only with the time period after July 2005.

At the fourth step, the ALJ considered Murphy's RFC and concluded that she was unable to perform her past work as a CNA on a full-time basis. Consequently, the ALJ moved to the last step of the inquiry, a determination of whether there were a sufficient number of available jobs for a person with Murphy's RFC. The ALJ concluded that there existed a significant number of jobs that Murphy could perform based on the VE's testimony, and thus Murphy was not disabled under the Social Security Act.

The Appeals Council denied Murphy's request for review, making the ALJ's ruling the final decision of the Social Security Commissioner. *See Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009). Murphy sought review of the Commissioner's decision in federal district court. But the district court denied Murphy's request and affirmed the Commissioner's decision to deny benefits. Murphy subsequently filed a motion to amend the judgment, but the district court denied that motion also. Murphy now appeals.

II.

We review the ALJ's decision "to see if it is supported by 'substantial evidence.'" *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting 42 U.S.C. § 405(g)). Substantial evidence "means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We do not reweigh the evidence or substitute our own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

*A. Social Functioning*

On appeal, Murphy contends that the ALJ failed to properly find limitations in her social functioning. In support, Murphy points to the opinion of Dr. Glen, who observed that Murphy "could not work well with the public," due to, among other things, "her irritable and demanding personality." Murphy thus argues that it was erroneous for the ALJ to believe that she was able to work with the public, and to suggest to the VE a hypothetical where social contact was permitted.

We see no error by the ALJ. Dr. Glen's opinion was not that Murphy could not work at all with the public, but that she "could not work *well* with the public but otherwise is able to do simple, unskilled work." (Emphasis added.) In addition, on the "social interaction" section of his worksheet, Dr. Glen noted that Murphy was "not significantly limited" for three characteristics and only "moderately limited" for two characteristics. Notably, Dr. Glen did not find that Murphy was "markedly limited" in any category, which was the greatest degree of limitation in social functioning. But most importantly, the ALJ did acknowledge that there was "mention of an inability to get along with others"—but the ALJ rejected this limitation in

social functioning based on Murphy's employment history and based on Murphy's testimony that she did not have a problem getting along with people. In particular, during the time of her application for disability benefits, Murphy was working as a CNA on weekends for 15 hours a week, a job that requires contact with the public. This is sufficient evidence from which the ALJ could properly reject the limitation that Murphy have no contact with the public. As we have previously explained,

> In determining what a claimant can do despite his limitations, the SSA [Social Security Administration] must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

*Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995)) (internal citations omitted). In Murphy's case, the ALJ properly considered the entire record and resolved conflicting evidence in a reasonable manner.

*B.  Mental Limitations*

Murphy also argues that the ALJ failed to properly find that she suffered from mental limitations. In particular, Murphy faults the ALJ for not adopting all of Dr. Glen's opinion with regard to Murphy's mental limitations and for not giving more weight to the opinion of Dr. Radomska, who opined that Murphy had a possible delusional disorder.

We again find no error in the ALJ's decision. The ALJ did not find that Murphy had no mental limitations—in fact, the ALJ accepted the position of Murphy's treating physician, Dr. Woodard, who opined that Murphy suffered from depression. Instead, the finding of the ALJ was that Murphy's mental impairment of depression did "not cause more than minimal limitation in [Murphy's] ability to perform basic mental work activities and is therefore nonsevere." Coming to this conclusion, the ALJ properly evaluated Dr. Glen's report. Though Dr. Glen noted that Murphy had "moderate" functional limitations in some areas such as maintaining concentration, Dr. Glen's final conclusion regarding Murphy's functional capacity assessment was that she was "able to do simple, unskilled work," and this was the assessment that the ALJ adopted as his own.

Moreover, the ALJ did not erroneously reject Dr. Radomska's opinion. Dr. Radomska, the psychiatric consultative examiner, examined Murphy on only one occasion, and then opined that a mental disorder was "possible," without identifying any specific functional limitation. Based on Dr. Radomska's limited relationship with Murphy, the ALJ's failure to give controlling weight to Dr. Radomska's opinion was not in error. *See* 20 C.F.R. §

404.1527(d)(2). Later, Dr. Glen reviewed Dr. Radomska's report and ascertained that although a serious mental condition might be possible, because of the absence of any family history and the absence of past psychiatric treatment, an actual diagnosis of a serious mental condition could not be made. As mentioned above, Dr. Glen's final assessment after considering Dr. Radomska's opinion was the one adopted by the ALJ—that Murphy was capable of doing simple, unskilled work. Finally, the ALJ noted that Dr. Radomska's opinion was "not supported by the record as a whole, including [Murphy's] past as well as her current work history as a certified nurses aide, as well as [her] testimony at the hearing in which she denied being depressed."

The evidence in the record supporting the ALJ's finding that Murphy's depression and any resulting mental limitations were not severe included the opinions of Drs. Woodard and Glen, as well as Murphy's testimony and medical history. This evidence is adequate to support the conclusion that Murphy did not suffer from severe mental limitations that compromised her ability to do simple, unskilled work, and so we must defer to the ALJ's judgment.

*C. Physical Limitations*

Murphy also contends that the ALJ failed to properly accept her treating physician Dr. Woodard's opinion regarding her physical limitations. The ALJ accepted most of Dr. Woodard's assessment of Murphy's physical limitations, but did reject one important finding: that although performing a job that permitted her to shift positions at will, Murphy could sit, stand, and walk for no more than a total of two hours a day. In rejecting this finding, the ALJ relied on the state agency physicians' reports which reviewed Dr. Woodard's opinion and concluded that this two-hour limitation was based on Murphy's subjective complaints and not on objective medical evidence. In his ruling, the ALJ also cited the objective medical evidence that supported the state agency physicians' reports, which included normal x-rays, normal CT scans, and an unremarkable consultative examination with Dr. Villaneuva. Further, the two-hour limitation was inconsistent with Murphy's part-time work as a CNA for 15 hours every weekend for almost two years, and with Murphy's claim that she was seeking full-time work.

It was not erroneous for the ALJ to reject the two-hour limitation of Dr. Woodard's opinion, even though he was Murphy's treating physician. "A treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'consistent with substantial evidence in the record.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). On this particular issue, because Dr. Woodard's opinion was inconsistent with objective medical evidence and Murphy's part-time work as a CNA, it was not erroneous for the ALJ to discount Dr. Woodard's opinion and to rely on that of the state agency physicians. *See id.* (explaining that

"if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it").

Similarly, Murphy also argues that ALJ erred by not accepting Dr. Woodard's findings that Murphy required the ability to miss three days of work per month. But this finding was not supported by any objective medical evidence, and was inconsistent with Murphy's own testimony and her record of steady part-time employment. Because there was adequate evidence supporting the finding that Murphy had no limitation requiring her to miss work each month, we must defer to the ALJ's decision. *See Schmidt*, 201 F.3d at 972.

*D. Credibility*

Finally, Murphy contends that the ALJ failed to make a proper credibility determination because the ALJ allegedly assessed Murphy's credibility in a backwards manner, by first establishing Murphy's RFC and then determining her credibility by whether her testimony fit with this RFC. In other words, Murphy argues that the ALJ found testimony which corresponded to the ALJ's prior assessment of Murphy's RFC to be credible, but found testimony which did not correspond to be not credible.

"We review an ALJ's credibility determination deferentially and uphold it unless it is patently wrong. We look to whether the ALJ's reasons for discrediting testimony are unreasonable or unsupported." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010) (internal citations omitted). With this standard of deference, we cannot say that the ALJ's credibility determination was patently wrong and that this case merits remand. The ALJ found that Murphy's statements regarding the intensity, persistence, and limiting effects of her physical symptoms were not credible—in short, that she was exaggerating the severity of her symptoms—because they were inconsistent with objective medical evidence and with her part-time weekend work as a CNA. In contrast, those portions of Murphy's testimony where she denied suffering from depression or an inability to interact with the public were consistent with some of Murphy's medical opinions and medical history as we described above in parts A and B. Thus, we cannot conclude that the ALJ was selectively crediting or doubting portions of Murphy's testimony in order to support a preconceived opinion of Murphy's RFC.[2]

---

[2]In her opening brief, Murphy also argues that the ALJ failed to identify inconsistencies between the job descriptions in the VE's testimony and the descriptions in the Dictionary of Occupational Titles. The Commissioner countered that this argument was not presented to the district court, and is therefore waived. In Murphy's reply, she concedes the point and withdraws the issue.

III.

For these reasons, the decision of the district court is AFFIRMED.