# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1682

LINDA K. RODDY,

*Plaintiff-Appellant*,

*v.*

MICHAEL J. ASTRUE,
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 4:11-cv-23-TWP-WGH—**Tanya Walton Pratt**, *Judge.*

ARGUED DECEMBER 12, 2012—DECIDED JANUARY 18, 2013

Before POSNER, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Linda K. Roddy suffers from a number of serious medical problems, including in particular severe lower back pain attributable to degenerative disc disease. Eventually, when her pain became unbearable, she stopped working and applied for disability insurance benefits under the Social Security Act. She was unsuccessful before both the Social Security

Administration and an administrative law judge (ALJ), who found that there were jobs in the national economy within her capabilities, even though she no longer could perform her old job as a shift manager at a Taco Bell restaurant. The district court, reviewing the agency's decision under 42 U.S.C. § 405(g), found that substantial evidence supported the Commissioner's decision, and so Roddy has now turned to this court. We conclude that the ALJ made a number of errors in his consideration of the record; we therefore remand Roddy's case to the agency for further proceedings.

**I**

Roddy was born in 1964 and so by now is in her late 40s. She has suffered from degenerative disc disease, among other ailments, since 1999. From 1985 until 1999 she worked full-time, mostly as a shift manager at Taco Bell, and was largely untroubled by health problems. Her luck changed in 1999, when, at the age of 34, she was in a car accident. She went to an emergency room at that time complaining of pain in her neck, forehead, shoulders, and back. There she received pain medication and was released the same day. Unfortunately, however, her pain did not subside, and she began to have difficulty doing her job and even getting dressed in the mornings. A month later she sought treatment from a chiropractor, Richard Hilton, who saw her for about eight months but then referred her to a pain management specialist, Dr. Gary Wright. Before referring Roddy, Hilton noted that she had not experienced as much improvement as a typical patient would have.

Dr. Wright treated Roddy from November 1999 through 2006. During his first appointment with her, Dr. Wright took her medical history and performed a physical examination. Over the following year he treated her in several ways: he scheduled her for an assessment using magnetic resonance imaging (MRI); and he performed both a discography (an injection procedure that identifies the source of pain by putting pressure on discs in the spine) and a spinoscopy (a procedure used to study the movement of the spine). The MRI revealed mild to moderate degeneration of one of the discs in Roddy's lower spine as well as a tear in the cartilage around that disc. The discography indicated that the torn and degenerating disc in Roddy's lower back was the source of her pain. The spinoscopy demonstrated significant functional problems with the movement of her spine, especially as she was asked to carry heavier loads. Based on these findings, Dr. Wright diagnosed Roddy as suffering from several disorders of the spine, including degenerative disc disease and sacroiliitis (an inflammation of the joints in the lower back, see AMERICAN MEDICAL ASSOCIATION, COMPLETE MEDICAL ENCYCLOPEDIA 1086 (Jerrold B. Leikin & Martin S. Lipsky eds. 2003)).

From 1999 through 2003, Dr. Wright performed over 36 procedures on Roddy's spine, including nerve-block injections and prolotherapy injections, but he was unable permanently to relieve her pain. He prescribed various pain medications for Roddy including Methadone and Oxycontin. At first the injections and pain medication substantially alleviated her pain for periods

lasting three or four months, but these procedures became less effective over time, eventually providing only three or four weeks of relief. Dr. Wright also recommended that Roddy undergo a procedure called intradiscal electrothermal therapy to cauterize the nerve endings in her damaged disc. She was unable to do so, however, because her insurance carrier refused to pay for the procedure and instead suggested that she undergo spinal-fusion surgery. Dr. Wright disagreed with that idea because of Roddy's age, and Roddy followed his advice.

Dr. Wright also became convinced that Roddy's job at Taco Bell was aggravating her condition. He thus recommended numerous work restrictions, such as limiting her work and the weight she was required to carry. Taco Bell, however, did not adopt these restrictions, especially during busy times of the day. Dr. Wright imposed a final work restriction on Roddy in June 2002, stating that the most she could work would be six hours a day, five days a week. Over the following three years during which he treated Roddy, Dr. Wright never altered or revoked this restriction.

Between September 2003 and Roddy's final appointment in January 2006, Dr. Wright treated Roddy less frequently, because she had lost her health insurance and no longer could afford prescriptions or further procedures. During this period, Dr. Wright provided her with samples of Vioxx and other pain medications, but those drugs did not alleviate her pain. Despite her financial limitations, he scheduled her for another

MRI, which produced results consistent with her first one. She also had a surgical consultation. The only additional procedures Dr. Wright performed between September 2003 and January 2006 were more nerve-block injections in November 2005.

In October 2003, Dr. Wright was deposed in connection with a lawsuit Roddy had filed stemming from her car accident. He reviewed the treatments he had given Roddy, his diagnosis of her condition, and his opinion about her ability to work. He also noted that her condition had deteriorated since he began treating her and that her pain had increased. When asked why, Dr. Wright explained that Roddy's insurance had refused to pay for intradiscal electrothermal therapy, and that without that procedure she could not obtain long-term relief from her pain. Her pain prevented her from exercising, and thus from building strength in her back muscles; this deconditioning in turn aggravated her existing problems. Dr. Wright predicted that Roddy's ability to work would diminish to the point that she would not be able to remain in the workforce.

Roddy filed her application for Social Security disability insurance benefits in November 2007, alleging disability beginning in November 2005 on account of headaches, dementia, torn discs in her spine, and pain in her back, neck, hips, knees, and shoulders. In connection with her application, Roddy was evaluated by an internist, Dr. Larissa Dimitrov, and two clinical psychologists, Susan Conners and Robert Kurzhals. The psychologists identified no serious medical conditions.

Dr. Dimitrov examined Roddy and found that despite a somewhat decreased range of motion in her back, knees, and hips, she was able to walk normally, get on and off the examining table without difficulty, and was otherwise not disabled.

In 2008 the agency interviewed Roddy and her friend, Sharon Kemp, about Roddy's quality of life and ability to perform daily activities. Roddy asserted that because of the pain in her lower back, she had not worked since being fired by Taco Bell in 2005. Roddy explained that her condition had significantly impeded her daily activities and forced her to spend most of the day lying down on her couch and heating her back. She stated that bending at the waist caused her pain and that she could not sit for a long period of time or stand continuously for more than 20 to 30 minutes. As a result she could no longer play softball or exercise, she was forced to stop often to stretch while driving for more than a short distance, and her household chores were much more difficult to complete. Before she began experiencing back pain, Roddy was able to clean her mobile home in one day. By 2008, she said, she was unable to lift more than 10 pounds, had difficulty negotiating stairs, could not sweep and mop a single room in her home in the same day, completed her household cleaning only in intervals, and had to lie down to rest and stretch her back for an hour or more before finishing cleaning any one room. She usually limited herself to making sandwiches and microwaving meals to reduce the time she spent standing while cooking. Even doing laundry required her to lie

down and rest her back between loads. She could, however, care for her dog and mow her lawn on a riding mower. Though Roddy visited with Kemp once a month, Kemp noted that they often had to stop playing cards or watching a movie so that Roddy could stretch her back.

Based on the record we have described, the state agency denied Roddy's claim initially and on reconsideration; Roddy then requested a hearing before an ALJ. At that hearing, which took place in 2010, Roddy and William J. Kiger, a vocational expert, testified. Roddy testified about her daily activities and noted that she now had a friend living with her to help around the house. Roddy still did some sweeping and dusting but no longer mopped. She could go grocery shopping, but after 30 minutes in the store she struggled to finish her shopping, and her friend had to assist her with putting the groceries away at home so she could lie down. Roddy's friend also assisted with laundry, cooking, and yard work, and helped Roddy dress. Roddy reported pain from sitting or standing for longer than 20 minutes and said that she had to lie down and stretch her back three times a day for an hour or two. Kiger testified that even if Roddy's condition required her frequently to alternate between sitting and standing, she still could perform a wide range of sedentary work available in the regional economy, including such jobs as a production worker, sorter, or order clerk.

The ALJ found that Roddy was not disabled after evaluating her claim under the five-step sequential

process detailed in 20 C.F.R. § 404.1520(4). He found that she satisfied steps one and two. She was no longer engaged in substantial gainful activity (step one), and the medical evidence established that she had severe medical impairments, including degenerative disc disease, disorders of the back, left wrist pain from a cartilage tear, cubital tunnel syndrome, headaches, and hip pain (step two). Roddy's alleged mental impairments, he concluded, are not severe. For purposes of step three, he found that her impairments do not meet the criteria to show presumptive disability.

Between the third and fourth steps, the ALJ concluded that Roddy's residual functional capacity allows her to perform jobs that permit her to alternate sitting and standing on a regular basis and that do not require carrying more than five pounds regularly, pushing, pulling, climbing, reaching overhead, or walking over uneven terrain. In reaching this determination the ALJ, using boilerplate that this court has consistently criticized, see *e.g.*, *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), concluded that, though Roddy's conditions *could* reasonably be expected to cause the level of pain she complained of, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." The ALJ discounted Roddy's testimony because she had not sought treatment for her condition since 2005, instead managing to "maintain and cope" using only over-the-

counter medications, and was able to care for herself and her pet and complete household chores. Although, for step four, the ALJ determined that Roddy cannot perform her past work, he concluded for purposes of step five (where the Commissioner bears the burden of proof) that she remains able to perform a range of sedentary work.

## II

Because the Appeals Council declined Roddy's request for review, the ALJ's ruling represents the Commissioner's final decision. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). We review the ALJ's decision directly without giving deference to the district court's assessment and will uphold the agency's decision so long as it uses the correct legal standards and the decision is supported by substantial evidence. *Id.*; *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

Roddy's first argument is that the ALJ failed to give sufficient weight to Dr. Wright's opinion, or at the very least the ALJ did not adequately explain why Dr. Wright's views should be set aside. Dr. Wright had opined that she could work at most six hours a day, five days a week. Because, according to the Social Security Administration, a person who cannot work eight hours a day, five days a week, or the equivalent, is disabled, see SSR 96-8p, 1996 WL 374184 at *1 (Jul. 2, 1996), if Dr. Wright is correct, then a finding of disability must follow.

An ALJ must consider all medical opinions in the record. See 20 C.F.R. § 404.1527(b), (c); *Knight v. Chater*, 55 F.3d 309, 313-14 (7th Cir. 1995). Yet in this case, the ALJ never mentioned Dr. Wright's conclusion from 2002 that Roddy could not handle a full-time job, nor his statement in his 2003 deposition that Roddy's ability to work would continue to diminish to the point where she could not remain in the workforce at all. Instead, the ALJ briefly touched on Dr. Wright's treatment of Roddy in one paragraph, after he earlier alluded to the fact that Dr. Wright's deposition testimony was in the record. Ultimately, the ALJ decided to credit Dr. Dimitrov's opinion that Roddy was capable of working. It is impossible, however, to know what the ALJ found lacking in Dr. Wright's testimony. This is a serious omission. Although the ALJ was not required to address in writing every piece of evidence or testimony presented, he was required to provide "an accurate and logical bridge" between the evidence and his conclusions, *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011). No such "bridge" appears in this opinion.

The ALJ's failure explicitly to address Dr. Wright's opinion about Roddy's ability to work is especially troubling because Dr. Wright was Roddy's treating physician. A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Even though the ALJ was not required to give Dr. Wright's opinion

controlling weight, see *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Skarbek*, 390 F.3d at 503, he was required to provide a sound explanation for his decision to reject it and instead to adopt Dr. Dimitrov's view. See 20 C.F.R. § 404.1527(c)(2); *Jelinik v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

The agency's regulations shed some light on how the ALJ should approach the question of the weight to be given to a doctor's opinion. They state that more weight should be given to the opinions of doctors who have (1) examined a claimant, (2) treated a claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, (5) offered opinions that are consistent with objective medical evidence and the record as a whole. 20 C.F.R. § 404.1527(c)(2)(i), (ii). All of these factors point toward giving significant weight to Dr. Wright's assessment of Roddy. He specialized in treating people with back pain resulting from spinal conditions. He examined Roddy frequently over the approximately six years that he treated her, and he used MRIs, discographies, and spinoscopy as diagnostic aids. His conclusions about Roddy's pain were consistent with the results of these tests, which revealed that she had degeneration and a tear around one of the discs in her lower back and that those abnormalities caused pain and diminished function in her back. In contrast, Dr. Dimitrov does not specialize in conditions of the spine or treating

pain; she examined Roddy on only one occasion; and she did not discuss (and possibly did not even review) the objective medical evidence from Roddy's MRIs, discographies, and spinoscopy.

Though the ALJ did not discuss any of these factors explicitly, he did mention in passing two possible reasons for rejecting Dr. Wright's opinion: the fact that many years had elapsed since Roddy's car accident, and his belief that the results of Roddy's MRIs were "essentially unremarkable." But the first "reason" tells us nothing useful. The term "degenerative" implies that Roddy suffers from a condition that will get worse over time, especially without proper treatment; it is not one that will remain stable or improve. See Pablo R. Maizno & Carl Lauryssen, *Annular Repair and Barrier Technologies*, *in* THE LUMBAR INTERVERTEBRAL DISC 113 (2009). The ALJ did not even discuss Dr. Wright's explanation that Roddy's condition had deteriorated and her pain had increased because she was unable to exercise and had therefore become weaker.

In fact, the situation is worse than that. The ALJ misunderstood or mischaracterized the results of the MRI. Rather being unremarkable, those results demonstrated mild to moderate degeneration in one of the discs of Roddy's lower spine as well as a tear in the cartilage surrounding that disc. The ALJ should have, but did not, explain why Dr. Wright's opinion about the severity of Roddy's pain is inconsistent with such findings. See *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

The Commissioner speculates that the ALJ could have rejected Dr. Wright's opinion because Roddy continued to work full-time after Dr. Wright told her to confine herself to working no more than six hours a day, five days a week. But the Commissioner cannot defend the ALJ's decision using this rationale directly, or by invoking an overly broad conception of harmless error, because the ALJ did not employ the rationale in his opinion. See *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). In fact, the premise of this argument is also flawed. Had the ALJ reviewed Roddy's work history, he would have seen that she worked substantially less than the six hours a day, five days a week to which Dr. Wright restricted her, and she did not work at all after her alleged onset date of disability in 2005. The fact that Roddy pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain, does not preclude her from establishing that she was disabled. *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003).

As a final note, the Commissioner might have (but did not) argue that Dr. Wright's opinion concerning Roddy's ability to work was not the kind of "medical opinion" that the ALJ must evaluate under 20 C.F.R. § 404.1527(b), (c). The agency's regulations assign the decision about ability to work to the Commissioner. See 20 C.F.R. § 404.1527(d)(1); *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). But it is just as well that the Commissioner is not defending the decision on that ground. Even if Dr. Wright's opinion of Roddy's ability to

work is not a "medical opinion" under the regulatory checklist, that does not mean that the ALJ should have ignored that statement. *Bjornson*, 671 F.3d at 647; *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). Although the ALJ does "not give any special significance" to such opinions, he still must consider "opinions from medical sources" in determining the claimant's residual functional capacity. 20 C.F.R. § 404.1527(d)(2)-(3); *Bjornson*, 671 F.3d at 647-48; *Barnett*, 381 F.3d at 669.

Roddy also argues that this court should remand because the ALJ erred by basing his credibility finding on two additional points: her failure to seek professional treatment for her back after 2006, and her ability to perform household tasks. She is correct in both respects. With respect to her failure to seek treatment, the Commissioner relies only on the broad principle that a claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." SSR 96-7p, 1996 WL 374186 at *7 (Jul. 2, 1996). But at the same time, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." *Id.*; see also *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); *Craft*, 539 F.3d at 678-79. Roddy had lost her health insurance and could no longer afford the nearly $3000 each procedure from Dr. Wright would cost her. The ALJ appears to have credited this assertion, stating in his opinion that "the last time she saw a physician was in

2005 because she has no insurance and cannot otherwise afford medical care." And the agency has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment. SSR 96-7p at *8.

The Commissioner also suggests that the ALJ might have rejected Roddy's justification for her infrequent visits to the doctor because she received a $500,000 settlement from her lawsuit. This, the Commissioner thinks, might have provided her with the means to seek treatment; he points out also that Roddy stated in 2008 that she was doing "okay" financially because of her settlement. But once again, the Commissioner runs up against the *Chenery* rule: although the ALJ mentioned Roddy's settlement in passing, he did not connect this statement to any conclusion that Roddy could afford treatment. Moreover, the ALJ could not have relied on the settlement without additional information; the record does not include such crucial facts as when Roddy settled her lawsuit or how much money she actually received after paying any medical bills and attorney's fees. The agency requires ALJs to inquire about a claimant's reasons for not seeking treatment. SSR 96-7p at *7-8. Had the ALJ been concerned about the significance of the settlement, he could have questioned Roddy about it at the hearing. Instead the ALJ merely asked her why she had not sought treatment, and asked no further questions after she explained that she could not afford treatment after having lost her insurance. In short, the ALJ should not have rested his credibility determination on Roddy's failure to seek treatment after 2006, at least as supported in this record.

The ALJ's reliance on Roddy's ability to perform household tasks was also mistaken. Once again, although it is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, SSR 96-7p at *3, this must be done with care. We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time. See, *e.g.*, *Bjornson*, 671 F.3d at 647; *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005); *Hawkins*, 326 F.3d at 918. Roddy testified in 2008 and again at her hearing that she must struggle to complete even the simplest and least strenuous of household activities. In 2008 Roddy reported that she could not clean even a single room of her mobile home on any given day, could not sweep and mop on the same day, limited herself to making sandwiches because standing to cook causes her pain, and had to lie down for more than an hour at a time on multiple occasions throughout the day to rest and stretch her back. A friend confirmed that Roddy could not finish a movie or card game without lying down to stretch her back. Roddy testified that by 2010 her condition had gotten worse, but that luckily she had a friend living with her to assist with household chores.

Faced with this evidence, the ALJ said only that, by taking over-the-counter medications, Roddy was able to remain self-sufficient and complete household chores, albeit by taking longer to do so. The ALJ criticized Roddy's testimony because he found her statements

from 2008 to be inconsistent with her testimony at her hearing in 2010. We do not see the conflict. By 2010, Roddy was fortunate enough to have a friend around to help with chores that she had described as causing her significant pain in 2008. Moreover, even if the ALJ's characterization of Roddy's statements was accurate, Roddy's condition was degenerative, meaning that it was likely that she had more limitations in 2010 than she did in 2008. Roddy's inability to get through the day without lying down three to four times for an hour, or to complete even simple chores requiring standing, like cooking, does not indicate an ability to work even a sedentary job full-time. See *Moss*, 555 F.3d at 562; *Craft*, 539 F.3d at 680; *Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006). As this court has noted, "one does sedentary work sitting . . . but not lying down," and no employer is likely to hire a person who must stop working and lie down two or three times a day for an hour at a time, or who requires multiple days to complete tasks other employees might finish in one workday. *Bjornson*, 671 F.3d at 646, 648.

For all these reasons, we VACATE the judgment of the district court and REMAND with instructions to remand the case to the Social Security Administration for further proceedings consistent with this opinion.