NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 20, 2013
Decided December 17, 2013

**Before**

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 13-2000

| | |
|---|---|
| DENNY R. GIVENS,<br>    *Plaintiff-Appellant,*<br><br>    *v.*<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br>    *Defendant-Appellee.* | Appeal from the United States District<br>Court for the Southern District of Indiana,<br>New Albany Division.<br><br>No. 4:12-cv-44-WGH-RLY<br><br>William G. Hussmann, Jr.,<br>*Magistrate Judge.* |

## O R D E R

Denny Givens challenges the denial of Social Security benefits. The Administrative Law Judge found that, although Givens's impairments prevent him from performing his past jobs, he can still perform other jobs available in the regional economy. In this court Givens argues that the ALJ failed to (1) give appropriate weight to the opinion of an examining physician, (2) properly account for his moderate limitations in concentration, persistence, and pace in the hypothetical posed to the vocational expert, and (3) resolve a perceived conflict between that expert's testimony

and the Dictionary of Occupational Titles. Because the ALJ did not err in any of those ways, we uphold the ALJ's decision.

Givens was born in 1967. During high school he attended special education classes and earned mostly B grades. Although he dropped out before graduating, Givens earned his high school diploma in 2005. Givens still has difficulty with reading and writing.

Despite suffering from chronic lower-back pain since a 1988 car accident, Givens worked as a truck driver for most of his adult life until 2002 or 2003 when, he says, the pain became too much. As a truck driver he transported freight and was required to complete log sheets.

In June 2004, Givens was diagnosed with lumbar degenerative disk disease when magnetic resonance imaging revealed disc degeneration in his lower back and some minor disc protrusion but no marked nerve root impingement. Dr. William Driehorst, a spine specialist, reviewed the MRI and concluded that Givens did not have "major back problems" but did seem "unmotivated or defeatist." Later that year Givens began cleaning vehicles to prepare them for sale at a car dealership but was fired in late 2005; according to Givens, he had missed too many days of work because of back pain.

In late June 2006, Givens applied for Social Security benefits claiming to be disabled by back pain, diabetes, arthritis, depression, numbness in his extremities, and headaches.[1] The next month, Dr. Chris Catt, a state-agency clinical psychologist,

---

[1] The Commissioner asserts that Givens was seeking only Disability Insurance Benefits. To qualify for disability insurance benefits, Givens was required to show that he was disabled before his date last insured, June 30, 2009. *See Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005). Thus the Commissioner insists that only medical opinions from before Givens's insured status expired are relevant. But Givens asserts that he also applied for Supplemental Security Income, to which he would be entitled if *presently* disabled and of limited means. *See* 42 U.S.C. §§ 1381a, 1382; *Sienkiewicz*, 409 F.3d at 802; *Steed v. Astrue*, 524 F.3d 872, 874 n.2 (8th Cir. 2008). The administrative record is unclear on this question. If there was a claim for Supplemental Security Income, it apparently was overlooked. The initial benefits determination, decision on reconsideration, Givens's request for a hearing, and the ALJ's decision reference only his claim for Disability Insurance Benefits. In the end, though, it really does not matter. The ALJ considered all of the

examined Givens. Dr. Catt noted that Givens had no history of ongoing psychiatric treatment and observed that he showed average intellectual functioning, exhibiting basic spelling and math skills as well as normal attention, concentration, speech, abstract thinking, and social skills. As a result Dr. Catt concluded that Givens had no symptoms of mental illness. Later that month Dr. Anjali Leley completed a physical examination for the state agency. Dr. Leley noted "no apparent acute distress" but did observe that Givens had "slight difficulty" walking, climbing onto and down from the exam table, and rising out of a chair and could not lay straight back on the exam table. She also detected limitations in Givens's range of motion in his left shoulder and knees. And whether sitting or lying down, Givens could not extend and raise either leg above 45 degrees, a sign of a likely herniated disc. Dr. Leley further noted that Givens's speech, affect, and motor skills were normal and that he could squat to the ground while holding the wall.

A few days later, in August 2006, another psychologist, Dr. J. Gange, reviewed Givens's medical records for the state agency and concluded that an "affective disorder" (which the psychologist never further identified) was "not severe," though Givens had mild "difficulties in maintaining concentration, persistence, or pace." Dr. J.V. Corcoran also reviewed Givens's records for the state agency and assessed his physical residual functional capacity. Dr. Corcoran concluded that Givens could sit, stand, or walk a total of 6 hours in an 8-hour workday. He could frequently balance, stoop, or crouch, but could only occasionally climb, kneel, or crawl. Givens had no communicative limitations. Dr. Corcoran also opined that Givens was overstating the severity of his symptoms. Other reviewing doctors endorsed the opinions of both Dr. Gange and Dr. Corcoran.

The Social Security Administration denied Givens's application for benefits in August 2006 and in November 2006 upheld that decision on reconsideration. Givens requested a hearing before an ALJ, which was conducted in October 2008. In the meantime Givens continued to complain of back and shoulder pain. At the October 2008 hearing, a vocational expert testified that, although Givens could not perform his past work, he still had the residual functional capacity to perform other jobs available in the regional economy as long as they had a sit/stand option. The expert's testimony was based on an industry article, but the expert could not produce it or even offer a citation for it on cross-examination.

---

medical evidence, including the records from after Givens's date last insured, and found that Givens could perform sedentary work despite his impairments.

Shortly after the hearing, Dr. Norman Mindrebo examined Givens and diagnosed him with asthma, diabetes, carpal tunnel syndrome, and spina bifida—"[a] birth defect in which there is incomplete closure in the spinal column." AM. MED. ASS'N, COMPLETE MEDICAL ENCYCLOPEDIA 1148 (2003). Dr. Mindrebo repeated the earlier "straight leg raising test" and, like Dr. Leley, surmised that Givens might have a herniated disc. The physician noted some hardening of the tissue around Givens's discs, which were otherwise "well preserved." An electromyogram and nerve-conduction study confirmed mild to moderate carpal tunnel syndrome. An MRI of Givens's lumbar spine showed multilevel lumbar spondylolysis, a defect in which soft tissue instead of bone protects the spinal cord and connects the vertebral bone to the facet joint, which was "slightly increased at L3-L4" compared to the previous MRI. AM. MED. ASS'N, *supra*, at 1154. The MRI also showed "mild disc bulging." But there was no "significant malalignment" or "definite nerve root impingement." And the MRI of Givens's left shoulder was normal.

Even though Givens's attorney never got a chance to review the vocational expert's article, the ALJ denied Givens benefits in April 2009, and Givens sought review. In the meantime, on June 30, 2009, Givens's insured status for disability benefits expired.

Givens filed a new claim for Disability Insurance Benefits on September 1, 2009, alleging an April 12, 2009, onset date. The next month, Dr. Corcoran again reviewed Givens's medical records to assess his physical residual functional capacity. Like in his previous assessment, Dr. Corcoran concluded that Givens could sit, stand, or walk for 6 hours in a workday and identified no communicative limitations. Dr. Donna Unversaw, a consulting psychologist, also performed a psychiatric review of Givens's records. Dr. Unversaw defined Givens's mental disorder as depression but, like Dr. Gange, concluded that the condition was not severe and that Givens had only mild "difficulties in maintaining concentration, persistence, or pace."

After the Appeals Council declined to review the ALJ's decision in December 2009, Givens sought judicial review in the district court, which in June 2010 remanded his case to the Appeals Council on a joint motion by Givens and the Commissioner. *See Givens v. Astrue*, No. 4:10-cv-00019-RLY-WGH (S.D. Ind. June 21, 2010). The Appeals Council in turn remanded the case to a new ALJ because the first ALJ had not determined whether the vocational expert's testimony was reliable and the vocational expert never provided the supporting article to Givens's counsel.

Givens continued to complain of shoulder pain to his family doctor, who ordered an X-ray of Givens's left shoulder. That X-ray revealed degenerative changes in the acromioclavicular joint. A specialist surgically repaired the shoulder in July 2010; additional surgeries were recommended but not scheduled.

In February 2011, Dr. Shuyan Wang, an anesthesiologist who specializes in geriatric medicine, examined Givens for the state agency. Dr. Wang observed Givens's limp, difficulty getting up from sitting, difficulty with toe and heel walking, and apparent pain during the exam, but also noted that he could sit for the duration of the exam, could explain his medical history, and exhibited normal intellectual function and affect. His hand functions were mostly normal, and though his back and shoulder were tender, this time Givens could raise his extended leg 60 degrees while lying down and 90 degrees while sitting. Dr. Wang opined that Givens "may not be able to work full time," and could perform only light-duty jobs with "some restriction for standing and walking" and the ability "to periodically change position from sitting." On a separate form, Dr. Wang limited Givens to sitting a total of 4 hours and standing or walking 1 hour each during a workday. He could sit continuously for 30 minutes, stand for 10 minutes, and walk for 5 minutes. Where the form requested the doctor to identify the particular medical or clinical findings which supported that assessment, Dr. Wang wrote: "He complains back pain with walking, standing and sitting. He has difficulty to get up from sitting."

The next month Dr. Jill A. Christopher performed a consultive psychological examination. Although Dr. Christopher reported that Givens seemed depressed, she also noted that his attention, activity level, memory, judgment, orientation, and speech were normal. She determined that Givens "may have some difficulty attending, concentrating and completing simple tasks due to significant depression." But on a form accompanying her assessment, she checked boxes indicating that Givens had no marked impairments of his ability to understand, remember, and carry out instructions. In fact, he had at most mild impairments of his ability to understand and carry out complex instructions and make complex work-related decisions.

At the hearing before the second ALJ in October 2011, Givens's counsel gave an opening statement in which he stressed Dr. Wang's findings that Givens could sit for only 4 hours, stand for 1 hour, and walk for 1 hour in a given workday. Givens testified that he suffers from lower-back pain, numbness in his legs, asthma, carpel tunnel syndrome in both hands, shoulder pain, difficulty raising his arms over his head, diabetes, neuropathy in his legs and feet, headaches, cartilage deterioration in his knees,

and depression, which had only gotten worse since his last hearing in October 2008. He testified that his depression causes him to "lose concentration pretty easy," making it difficult even to pay attention to a 30-minute television show. Givens explained that he could sit only for 3 or 4 hours during an 8-hour day and usually sleeps 15 to 18 hours in a given day. He also pointed out that, although he has obtained his diploma, he took special education courses in high school and initially dropped out. Givens testified that he does not read books, newspapers, or magazines, and had difficulty maintaining his logs as a truck driver, but can order from a menu at a restaurant.

Next, the ALJ asked a vocational expert to consider a hypothetical claimant:

[A] hypothetical individual the claimant's age, education, and prior work experience who is restricted to performing sedentary level work—sedentary work with the following additional restrictions: limited to occasional crouching, crawling, kneeling, stooping, balancing, and climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; no driving of automotive equipment; no work around hazards, such as unprotected heights or dangerous machinery; limited to occasional overhead reaching with upper extremities; limited to occasional operation of foot controls; frequent use of the upper extremities for handling and fingering; due to a moderate level restriction in concentration, persistence, or pace the worker would be restricted to performing unskilled, simple, repetitive tasks, which would not involve focused attention for more than two hours at one time and which would not involve rapid production paced work; and then due to a moderate level restriction in social functioning, the worker would also be restricted in social functioning, the worker would also be restricted to occasional contact with coworkers, supervisors, and the public.

The vocational expert testified that a claimant with those characteristics and restrictions could not perform his past work but could perform, among other jobs, inspector or tester jobs, packaging and machine-filling jobs, or jobs in protective services such as surveillance-system monitor. The ALJ next asked whether that hypothetical claimant would be able to perform those jobs if he was restricted in the way Dr. Wang 's report suggested—not sitting more than 30 minutes, standing for more than 10 minutes, or walking for more than 5 minutes at a time. The vocational expert responded that these restrictions would eliminate *all* unskilled sedentary work. Lastly the ALJ asked the vocational expert if her testimony is consistent with the Department of Labor's

Dictionary of Occupational Titles, and she said yes. Givens did not object. On cross-examination, the vocational expert testified that in order to work as a surveillance monitor "one would have to have some ability to concentrate."

After evaluating her claim under the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), the ALJ found Givens not disabled. First he found that Givens had not engaged in substantial gainful activity since his alleged onset date. At the second and third steps, he determined that the medical evidence established that Givens suffers from severe medical impairments—degenerative disc disease of the lumbosacral spine, carpal tunnel syndrome, degenerative joint disease of the left shoulder, obesity, mild osteoarthritis of the knees, diabetes mellitus, and depression—but that his impairments do not meet the criteria to show presumptive disability. The ALJ then concluded that, although Givens cannot perform his past work, he remains able to perform some sedentary work including inspector/tester, packager/folding-machine operator, and security-system monitor. The ALJ gave "little weight" to Dr. Wang's report and "greater weight" to Dr. Corcoran's 2009 assessment, noting that Dr. Wang's assessment of Givens's residual functional capacity is "not supported by the relatively modest level of change shown on the MRI studies" and seemed to be based "entirely upon the claimant's allegations and complaints." The ALJ also determined that Givens had moderate limitations in concentration, persistence, and pace. A magistrate judge, presiding by consent, affirmed the decision.

Because the Appeals Council declined Givens's request for review, the ALJ's ruling is the final decision of the Commissioner of Social Security. *See Schomas v. Colvin*, No. 13-1197, 2013 WL 5485143, at *4 (7th Cir. Oct. 3, 2013); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). We review the ALJ's decision directly, without reweighing the evidence, and will uphold the ALJ so long as his ruling is supported by substantial evidence. *Roddy,* 705 F.3d at 636; *O'Connor-Spinner*, 627 F.3d at 618; *Prochaska v. Barnhart*, 454 F.3d 731, 734–35 (7th Cir. 2006).

**A. The ALJ's consideration of the medical evidence**.

Givens first accuses the ALJ of violating 20 C.F.R. § 404.1527(c)(1) by weighing the opinion of a non-examining physician, Dr. Corcoran, over that of an examining physician, Dr. Wang. After examining Givens, Dr. Wang opined that Givens could sit continuously for only 30 minutes, stand for 10 minutes, and walk for 5 minutes. Because

the vocational expert testified that a claimant with those limitations would not be able to do even sedentary work, if Givens is correct, he would be considered disabled.

Although an ALJ generally affords "more weight to the opinion of a source who has examined" a claimant than to the opinion of a source who has not, the weight ultimately given to that opinion depends on its consistency with and objective medical support in the record; the quality of the explanation the source gave for the opinion; and the source's specialization. 20 C.F.R. § 404.1527(c); *see Roddy*, 705 F.3d at 637. Relying on *Gudgel v. Barnhart*, 345 F.3d 475 (7th Cir. 2003), Givens seems to argue that the ALJ improperly relied on Dr. Corcoran's contradictory opinion of Givens's physical residual functional capacity to discount Dr. Wang's. Although an ALJ cannot reject an examining physician's opinion based solely on the contradictory opinion of a non-examining physician, *see Gudgel*, 345 F.3d at 470, the ALJ here did not even mention Dr. Corcoran's opinion when deciding to discount Dr. Wang's report. The ALJ gave two reasons for discounting Dr. Wang's opinion: it is (1) inconsistent with the MRIs, and (2) appears to be based on Givens's complaints rather than the examination.

The ALJ provided an adequate explanation for giving little weight to Dr. Wang's opinion. The ALJ determined that the opinion conflicts with the objective medical evidence:

> The limitations listed in the assessment are not supported by the relatively modest level of change shown on the MRI studies of record. Neither of these studies showed any nerve root compression or even contact. . . . Even though Dr. Wang did note some significant neurological findings such as a positive straight leg raising and some reflex loss, the level of documented pathology shown on the imaging studies of record is consistent with a physical ability to perform sedentary work within the limitations described in the above finding.

An ALJ may discount even a treating physician's opinion if it is inconsistent with the medical record. *See* 20 C.F.R. § 404.1527(c)(2), (4); *Roddy*, 705 F.3d at 636; *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Gudgel*, 345 F.3d at 470. In *Roddy*, the ALJ rejected the treating physician's opinion that the claimant could not work full time because the claimant's earlier MRIs had been "unremarkable." *See Roddy*, 705 F.3d at 637. In rejecting that explanation, we reasoned that the doctor had diagnosed the claimant with degenerative disc disease, which by definition would worsen over time, and the ALJ had failed to discuss the reasons the doctor gave for why the claimant's

condition had substantially deteriorated. *Id.* Like the claimant in *Roddy*, Givens was diagnosed with degenerative disc disease, and, like the ALJ in *Roddy,* the ALJ here discounted the doctor's opinion based in part on its inconsistency with the MRIs in the record.

But the ALJ here was not unreasonable. Unlike the doctor's opinion in *Roddy*, Dr. Wang's opinion was given without benefit of spinal imaging or an extended treating relationship. Furthermore, unlike the explanation given by the doctor in *Roddy,* the record here does not reflect any reason for any change in Givens's condition since the last MRI. And the change in Givens's condition between the two MRIs reflected slow degeneration. Dr. Driehorst, the spine specialist who reviewed the 2004 MRI, did not perceive major back problems. And the 2008 MRI showed only a "slightly increased" lumbar spondylosis since 2004. Moreover, neither MRI showed any nerve root impingement. In fact, Dr. Wang's 2011 examination did not reflect degeneration. Givens could now lift his extended legs to 60 degrees from the supine position, up from 45 degrees in 2006, and all the way to 90 degrees from sitting, also up from 45 degrees in 2006. Perhaps a more recent MRI would have been consistent with Dr. Wang's assessment, but there is no such MRI in the record.

It was also reasonable for the ALJ to discount Dr. Wang's opinion because that opinion appears to rest on Givens's own assessment about how long he can continuously sit, stand, or walk. An ALJ may give less weight to an opinion that appears to rely heavily on the claimant's subjective complaints, even if the source of that opinion had examined the claimant. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give the opinion. The better explanation a source provides for an opinion the more weight we will give that opinion."); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Ketelboeter*, 550 F.3d at 625; *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Before affording "little weight" to Dr. Wang's opinion that Givens could not even perform sedentary work, the ALJ discussed Dr. Wang's examination notes and initial comment that Givens would be able to perform light-duty jobs. But, as the ALJ noted, when it came time to support her opinion about Givens's inability to sit, stand, and walk for even short periods, Dr. Wang cited no medical evidence and instead wrote only that Givens complained of pain when performing those activities and had difficulty getting up from a seated position. Therefore, the ALJ articulated two adequate explanations for giving little weight to Dr. Wang's opinion. *See Skarbek v. Barnhart*, 390 F.3d 500, 503–04 (7th Cir. 2004) (concluding that ALJ did not err in discounting treating-physician's opinion because it

was inconsistent with X-rays and the physician had failed to identify other medical evidence supporting his view).

### B. The hypothetical posed to the vocational expert.

Givens next argues that the ALJ inappropriately accounted for his moderate limitations in concentration, persistence, and pace in the hypothetical the ALJ posed to the vocational expert by limiting the hypothetical claimant to jobs not requiring more than 2 hours of continuously focused attention. This was a problem, Givens says, because a maximum of 2 hours of focused attention "is what is normal or expected in almost all employment," and so a 2-hour limitation is "no limitation at all."

An ALJ's hypothetical must account for all of the claimant's limitations, including deficiencies of concentration, persistence, and pace. *O'Connor-Spinner*, 627 F.3d at 619, *Simila v. Astrue*, 573 F.3d 503, 520–21 (7th Cir. 2009). Sometimes the ALJ attempts to accomplish this by limiting the hypothetical claimant to unskilled work, simple, repetitive tasks, or other "restrictions that do not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *O'Connor-Spinner*, 627 F.3d at 620. But the ALJ here followed best practices and expressly included Givens's moderate limitations in concentration, persistence, and pace. *Id.* at 620–21.

The ALJ chose to *further* limit the hypothetical claimant to jobs that, among other restrictions, would not require more than 2 hours of focused attention at a time. Givens seems to assume that a functional limitation must coincide with a dwindling number of jobs, and thus the ALJ's restriction was "illogical" because most jobs would not require more than 2 hours of concentration at a time. *See Braithwaite v. Comm'r of Soc. Sec.*, No. CIV S–09–2922–CMK, 2011 WL 1253395, at *5 n.4 (E.D. Cal. Mar. 31, 2011). Givens relies on *Warren v. Colvin*, No. 12 C 3298, 2013 WL 1196603, at *5 (N.D. Ill. Mar. 22, 2013), in which, he contends, the court remanded the case because it does not "make sense to conclude . . . that an individual with moderate limitations in the ability to maintain attention and concentration would require the same frequency of breaks as a typical worker," a break every 2 hours. This is a misreading of the decision. The judge already was remanding the case for other reasons and simply directed the ALJ to explore that issue on remand. *See Warren,* 2013 WL 1196603, at *5. And this case is distinguishable because the ALJ here restricted Givens to *less than* 2 hours of concentration, not 2 hours. Furthermore, as reflected on the form Dr. Christopher completed, Givens's moderate limitation still demonstrated satisfactory functioning. *See Roberson v. Astrue*, 481 F.3d

1020, 1024 (8th Cir. 2007). So it is not illogical that Givens would be able to perform most jobs despite his moderate limitations.

**C. The vocational expert's testimony and the Dictionary of Occupational Titles.**

Lastly, Givens insists that the ALJ erred in relying on the vocational expert's testimony that a hypothetical claimant with his characteristics could work as an inspector/tester or surveillance-system monitor without resolving a conflict between that testimony and the Dictionary of Occupational Titles. He contends that a hypothetical claimant with his educational background—special education in high school and not completing high school until he was almost 40 years old—would not be able to perform inspector/tester or surveillance-system monitor jobs because they required a General Educational Development language level of 3.

If a vocational expert's testimony "appears to conflict with the dictionary," SSR 00-4p requires an ALJ to obtain "a reasonable explanation for the apparent conflict." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011). But since Givens did not object at the hearing, "he would have to show that the conflict was 'obvious enough that the ALJ should have picked up on [it] without any assistance.'" *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (quoting *Overman*, 546 F.3d at 463).

The perceived conflict appears to be illusory, and if the vocational expert's testimony does conflict with the dictionary, that conflict is not obvious. First, as the Commissioner points out, the dictionary's General Educational Development levels focus on the worker's educational background, not on on-the-job requirements:

> General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

*See* DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, App. C (4th ed., Rev. 1991), *available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.GED. Thus workers satisfactorily performing jobs with a language development level of

3—like the tester or surveillance-system monitor positions here—would be expected to be able to read novels, magazines, atlases, encyclopedias, safety rules, and mechanical instructions; "[w]rite reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech;" and "[s]peak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice." *See* DOT, *supra* at App. C. Nowhere in the job descriptions for either position is a tester or monitor *required* to read novels or magazines. *See* DOT, *supra* at 281, 396.

Second, it is not obvious from the record that Givens would not meet those language development criteria. Givens never testified that he *cannot* read novels or magazines, just that he does not. And his testimony that he participated in special education in high school and dropped out early does not mean he obviously could not perform a job with a language level of 3. Students are placed in special education for myriad reasons ranging from minor learning disabilities to severe mental retardation, and all Givens said about his placement is that he had learning disabilities which hindered his ability to learn new tasks easily. Givens still received above-average grades, however, and ultimately completed his high school degree. And there is no basis to conclude from the record that Givens's intellectual functioning and language skills have declined because of his impairments. Throughout Givens's treatment, doctors opined that he had average intellectual functioning with no communicative difficulties.

But even if there was an obvious conflict, the ALJ's procedural error was harmless because his acceptance of the vocational expert's testimony was based on substantial evidence. *See Massachi v. Astrue*, 486 F.3d 1149, 1154 n.19 (9th Cir. 2007); *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 366 n.3 & 367 (8th Cir. 2007). Even if Givens does not meet the language standards for an inspector/tester or surveillance-system monitor (which is not clear from the record), it appears that he could meet the lower language requirements for packager/folding-machine operator. *See Ketelboeter*, 550 F.3d at 626; *Clay v. Barnhart*, 417 F.3d 922, 931 (8th Cir. 2005).

Accordingly, we AFFIRM the decision of the ALJ.