NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 19, 2014
Decided January 20, 2015

**Before**

DIANE P. WOOD, *Chief Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 14-1339

| | |
|---|---|
| TILLMAN LIGGINS III, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 12 C 4010 |
| CAROLYN W. COLVIN, | |
| Acting Commissioner of Social Security | Arlander Keys, |
| *Defendant-Appellee*. | *Magistrate Judge*. |

**O R D E R**

Tillman Liggins sought disability benefits based on chronic back pain, morbid obesity, and bilateral hand pain with numbness and tingling, but an administrative law judge found that despite these conditions Liggins retained the residual functional capacity (RFC) to perform sedentary work. Liggins now challenges the ALJ's findings; he focuses particularly on the RFC the ALJ used, the ALJ's negative credibility assessment, and the weight the ALJ gave to the opinion of Liggins's treating physician. Because substantial evidence does not support the ALJ's decision, we vacate and remand.

**I**

At the age of 41, Liggins applied for disability insurance benefits. Back problems, he asserted, had finally rendered him unable to work. Liggins is morbidly obese with a body mass index (BMI) that fluctuates between 48.1 and 50.77. In the past, he worked at a nightclub, first as a lounge manager for eight years and then as a security manager for nearly one more. For a time he did construction work and television installation, as well as some side mechanical jobs for family and friends. But he has not worked since February 2010, when lower back pain, numbness in his left leg, and numbness in the fingertips of both his hands, left him unable to hold a job.

In March 2010 he reported joint pain to his treating physician, Dr. Seth Osafo, an internist and director of a clinic in Bolingbrook, Illinois, who prescribed him an over-the-counter painkiller and recommended that he exercise and lose weight. Dr. Osafo did not observe any back abnormalities. Three months later Liggins reported to Dr. Osafo that he had injured himself while moving heavy furniture and was experiencing moderate lower back pain that radiated to his left thigh. Dr. Osafo noted moderate tenderness of the muscles surrounding the spine and observed that Liggins could not tolerate a straight-leg-raise test because of pain. The doctor also reported Liggins's complaints of worsening parethesias (tingling sensation in the skin, akin to a limb "falling asleep," often a result of disc degeneration and consequent pressure on the nerves) that was causing pain in both hands. Dr. Osafo prescribed a narcotic-like pain reliever for his back pain and ordered a nerve conduction study.

Further testing revealed nerve damage in both his legs and arms. A nerve conduction study showed damage to the nerves providing sensation to the lower and inner leg, thigh, and foot. A sensory study of the neck showed damage to the nerves providing sensation to the thoracic and abdominal walls, shoulder, inner arm, elbow, hand, and wrist. Dr. Osafo interpreted these findings as showing a brachial plexus lesion (damage to the nerves of the shoulder, arm, and hand), parethesias/numbness, low back pain, and inflammation of the spinal nerve roots.

In July 2010 Liggins underwent two MRIs. The first, of his neck, showed reduced flexibility resulting from disc dehydration and a narrowing of the openings through which nerves pass. The second MRI, of his lower back, showed a narrowing of the nerve openings and pressure on discs from disc protrusion, bulging, and spurring. Dr. Osafo continued to prescribe prescription painkillers, which gave Liggins some relief from back pain.

In August 2010, Liggins saw Dr. Meda Raghavendra, a pain specialist at Loyola Medical Center, who reviewed an MRI that Liggins brought with him and diagnosed signs of mildly degenerating discs. An examination showed that Liggins's lumbar flexion was limited to sixty degrees (normal is ninety), his lumbar extension was twenty degrees (normal is thirty degrees), and his left hip flexor muscle showed mild weakness. Dr. Raghavendra administered an epidural steroid injection. Dr. Raghavendra's diagnosis was confirmed the next month by a Loyola physiatrist, who examined Liggins and noted an antalgic gait (an abnormal gait adopted to accommodate pain).

On a form labeled "Physical Residual Functional Capacity Assessment," Dr. Francis Vincent, who was consulting for the Social Security Administration, reviewed the records and concluded in August 2010 that Liggins could stand, walk, and sit for six to eight hours a day because he had normal muscle strength. Dr. Vincent recognized that Liggins had some limitations, but "his statements of extreme limitations are disproportionate to the actual findings in file and are considered partially credible." Another reviewing (but non-examining) physician agreed with these findings in December 2010.

Later examinations continued to reveal significant problems. In November 2010 the Loyola physiatrist saw Liggins again and found chronic left lumbar radiculopathy (inflammation or irritation of a nerve root in the lumbar region) and damage or disease affecting the leg nerve. In January 2011 Dr. Athena Kostidis, a neurologist, examined Liggins and detected numbness in the left fifth digit that might have resulted from ulnar neuropathy (*i.e.* a trapped or pinched nerve in the wrist or elbow) or nerve root compression in the neck. Dr. Kostidis also ordered a sleep study, which revealed that Liggins had moderate sleep apnea. During the first half of 2011, Dr. Osafo found continued tenderness in the muscles surrounding the spine and a continued inability to complete a straight-leg-raise test because of pain. At the April 2011 exam Dr. Osafo noted that Liggins walked with a cane.

Liggins had another epidural steroid injection in June 2011. This did not alleviate his pain, and he was referred for a surgical consultation, after which he was referred to physical therapy. On a form entitled "Musculoskeletal Defects or Fractures Report," Dr. Osafo noted in July 2011 that Liggins experienced acute pain from "bending, prolonged sitting, prolonged standing, climbing stairs, [and] stooping." In August 2011 an MRI showed herniated discs.

## II

At the hearing before the administrative law judge in September 2011, Liggins pinpointed the source of his lower back pain to the area between the buttocks and the back, and he rated the pain between an eight-and-a-half and nine on a scale of ten. He said that he had to lie down to alleviate the pain, usually for most of the day, and that sitting, standing, and walking exacerbated the pain. He took a variety of prescription painkillers, muscle relaxers, and sleep aids, but these medications made him drowsy; he took as many as four or five naps a day. He could stand ten to thirty minutes, walk for ten to fifteen minutes, and sit for thirty minutes if he kept shifting his position. He could not put on his own shoes or pants. It took him twenty to thirty minutes to walk up the fifteen stairs in his house. He could not do housework or yard work and had to rely on family members to cook and care for his two younger daughters. He said he could no longer use the computer, because it was painful for him to sit for a prolonged period at a desk.

A vocational expert also testified. According to the VE, Liggins could perform his past work as a lounge manager if he were limited to light work under certain conditions (he needed to avoid concentrated exposure to hazards, could only occasionally balance, stoop, climb ramps and stairs, and could never climb ladders, ropes, scaffolds, or kneel, crouch, and crawl). The VE thought that if Liggins were limited to sedentary tasks, he could work as an automobile locator for dealerships, repair order clerk, or order clerk in the food and beverage industry, even if he needed to use his cane. If Liggins could perform only unskilled sedentary work, he could work as a surveillance monitor or document preparer.

The ALJ applied the required five-step analysis, see 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), and drew the following conclusions:

- Step 1: Liggins had not engaged in substantial gainful activity since the alleged onset date;
- Step 2: Liggins's degenerative disc disease, sleep apnea, and morbid obesity constituted severe impairments;
- Step 3: None of his impairments matched a listed impairment;
- Step 4: Liggins had the RFC to perform sedentary work with limitations on climbing, ramps, stairs, balancing, stooping, kneeling, crouching, and crawling; and

- Step 5: Given his age, education, work experience, and RFC, Liggins could work as an automobile locator, a repair order clerk, an order clerk, or, if limited to unskilled work, a surveillance system monitor.

In determining Liggins's RFC, the ALJ expressly declined to give controlling weight to the opinion of Liggins's treating physician, Dr. Osafo, whose views she said were "vague and imprecise as to the degree of limitation the claimant's pain would cause." She found the clinical findings to be "relatively benign." She also thought that Liggins's credibility was "undermine[d]" by "inconsistent information." For example, he testified that he could not work after February 2010 but was performing strenuous activity well afterward, even moving heavy furniture; he testified that he worked as a mechanic as a side job, but he grossed receipts of more than $10,000; he testified that he stopped smoking and drinking, but he acknowledged in February 2011 that both practices were "current"; he testified his wife helps with most daily activities, yet she worked six days a week; and his work history was sporadic. The Appeals Council denied review.

The magistrate judge, presiding by consent, concluded that substantial evidence supported the ALJ's decision. The judge agreed with the ALJ's decision not to give the treating physician's opinion controlling weight. The judge was also satisfied with the ALJ's determination of Liggins's RFC because she had addressed Liggins's various impairments and meaningfully considered all the medical evidence. The judge finally determined that the ALJ adequately explained why she found Liggins not credible.

**III**

On appeal, Liggins attacks the ALJ's RFC, her treatment of Dr. Osafo's opinions, and her rejection of his credibility. We agree with him that there are problems with each of these.

With respect to the RFC assessment, Liggins argues that the ALJ failed to substantiate her conclusion that he could sit the six to eight hours required for sedentary work despite his testimony that he could not sit for more than thirty minutes and Dr. Osafo's opinion that he could not sit for prolonged periods. An ALJ "must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). See also *Hughes v. Astrue*, 705 F.3d 276, 277–79 (7th Cir. 2013) (ALJ needed to explain how determined claimant's capabilities);

*Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (same). Liggins testified that his obesity and back pain limited his ability to sit for more than thirty minutes, yet the ALJ did not include a sitting limitation in the hypotheticals she posed to the VE. She also ignored the medical evidence (from both Dr. Osafo and the MRIs) suggesting that Liggins had sitting limitations. The government tries to salvage the ALJ's finding with the opinions of two state agency reviewing experts who opined that Liggins could sit for six to eight hours. But the ALJ nowhere relies on those reports, and so the *Chenery* doctrine prohibits the Commissioner's lawyers from relying on them now. See *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943); *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014).

Liggins next argues that the ALJ gave too little weight to Dr. Osafo's opinion that he could not sit for a prolonged period. The ALJ explained that she minimized this opinion because it was based on Liggins's subjective complaints and was too vague about the degree of limitation that his pain would probably cause. A treating physician's opinion, however, is entitled to controlling weight if it is consistent with objective medical evidence and the other substantial evidence in the record. 20 C.F.R § 404.1527(c)(2); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). The ALJ here ignored evidence in the record that was consistent with Dr. Osafo's opinion. For example, Dr. Raghavendra diagnosed Liggins with disc degeneration and gave him an epidural steroid injection for his pain; the physiatrist opined that the nerves in his back were inflamed; and the nerve studies and the MRIs showed nerve damage in Liggins's back, legs, shoulders, and arms. All of this evidence was consistent with Dr. Osafo's opinion that Liggins could not sit for prolonged periods. The ALJ downplayed these findings as "relatively benign," but she discussed only Dr. Kostidis's neurological examination as well as a hip x-ray that showed no hip abnormalities and Dr. Osafo's suggestion that Liggins lose weight and exercise. The ALJ erred by handpicking certain evidence and disregarding other key evidence. *Scrogham v. Colvin*, 765 F.3d 685, 696–99 (7th Cir. 2014); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

Liggins finally argues that the ALJ erred by using boilerplate that we have repeatedly criticized: that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." See *Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012). We have found this statement problematic because it puts "the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). Here the inconsistencies to which the ALJ points—his ability to move furniture, his smoking and

drinking, his side jobs as a mechanic, his wife's handling of daily activities, and his sporadic work history—have minimal, if any, bearing on his reports of pain and the limitations that he reported. We are particularly troubled by the ALJ's suggestion that she should discredit Liggins because he testified that his wife worked six days a week *and* helped with daily activities; numerous studies show that women working outside the home still routinely perform more housework than men. See *American Time Use Survey Summary*, BUREAU OF LABOR STATISTICS (June 18, 2014, 10:00 AM), available at http://www.bls.gov/news.release/atus.nr0.htm (finding that 83% of women versus 65% of men spent time doing household activities on average day with women spending 2.6 hours compared to men's 2.1 hours).

Because the ALJ failed to provide a reasoned basis for excluding a sitting limitation from Liggins's RFC, wrongly discounted his treating physician's opinion that he could not sit for prolonged periods, and erred in finding that Liggins was not credible, we VACATE and REMAND for further agency proceedings consistent with this order.